The first case this afternoon is Henry Mary Dukadjian, 516-0164, counsel for the appellant. You may proceed. Please state your name for the record. Your Honors, counsel, may it please the court, my name is Douglas Grinke. I also have co-counsel J.D. Brandmeier with me today. We represent the appellant, Courtney M. Stone, formerly known as Courtney Hodges. We request today that you reverse the ruling of the trial court. I'll discuss a couple of points that I have, but I rely on my brief to discuss the remaining points, unless, of course, the court has any other questions regarding those remaining points. The first thing I want to talk about, I'll talk about briefly, is the issue of hearsay. In this matter, there was a trial that was held. One of the biggest issues that came up was a meeting from November of 2006, in which present at this meeting was the appellant, Ms. Stone, also the appellee, Mr. Hodges, and then Ms. Connie Minoni, who was at the time an assistant attorney general for the state of Illinois. At that meeting, there are differing versions of what occurred at that meeting, but what came out at trial by Mr. Hodges was an allegation that Ms. Minoni had made statements to the effect that Mr. Hodges' child support would be reduced, and that, in fact, there would be an order that would be entered by her with the court that would, in effect, lower his child support. I think it's also important to note for the court that, in fact, they weren't even there on that issue. They were there on a rule to show cause against Mr. Hodges at that time. So at the trial level, at trial, there was a question that was asked, and it's in the record, the report of proceedings on page 14. There was a question that was asked by Mr. Hodges' counsel to Mr. Hodges. It's also important to note that Ms. Minoni was not there, nor was she called as a witness in this case. The question under direct examination by Mr. Raul, who was Mr. Hodges' attorney, so you brought those tax returns, and the attorney from HFS, which would be Ms. Minoni, took a look at those tax returns, and what did she suggest to you about how much you should be paying? Then there was an objection that was made. I made an objection based on hearsay. I said, objection, Your Honor, that's hearsay. The court then overruled the objection, again on page 14 of the report of proceedings, went on to a discussion about how in the courtroom, in practice, the attorney general meets with the litigants outside of the courtroom, works out a deal, and then comes back in. So once the discussion by the trial judge, Downer v. Judge Becker, was made, then Mr. Raul, the attorney for the appellee, again, in response to the hearsay objection, says, quote, and I don't mean to rehash anything, but I would like to address the concern about hearsay, because a lot of the testimony that Todd is going to give is hearsay, but it goes to the elements of equitable estoppel, which I skipped over before, and I apologize, nervous, and I forgot to mention that. So in essence, what Mr. Raul did at that point was, in his response to my objection for hearsay, says, well, it's hearsay, but it's relevant. It's relevant to the issue of equitable estoppel. Judge Becker didn't even go down that path. Instead, Judge Becker then says, as far as the technical basis for overruling the objection, the Department of Health and Human Services is a party to the case, because they were in there litigating on behalf of Ms. Stone, and so a statement by the AAG at that point is an admission by a party opponent. Then Judge Becker says, I don't know if that qualifies for that exception to the hearsay rule or not, but whether it does or not, it might. And then Judge Becker then said, I will consider it a continuing objection, so that I don't have to make that objection every time the statements are made regarding Ms. Minoni. The reason that that is so important is because when we got into the cross-examination of Mr. Hodges, the appellee in this case, I asked him a question. I said, let me ask you a question. So was it, in fact, someone from HFS that maybe told you that you should pay her a lower amount? Answer by Mr. Hodges, yes. Question, but it was never Ms. Stone? No, it was Ms. Minoni. So, in effect, what they're alleging are the statements that they're relying on for equitable estoppel were statements that were made by the Assistant Attorney General, not by Ms. Stone. One of the elements that has to be found in order to prove equitable estoppel is there has to be a statement or actions made by the other side. In this instance, there wasn't. We've also cited some cases in our brief to show that, in fact, the ruling by Judge Becker as to the hearsay exception is not a valid exception. An admission by a party opponent is not valid when it comes from an agent of the state. We cited in our brief People v. McDaniel, which, in fact, was a state's attorney that was involved in a case, and there was some discussion between a defendant and the state's attorney in that particular case. And the Appellate Court found, actually it was the Elementary Supreme Court found, that admissions by a government employee, particularly in this case the state's attorney, the Assistant State's Attorney, were not an admission by a party opponent because the state's attorney in those cases, and the Assistant Attorney General in this case, in fact, do not have an interest. They don't have an interest in the case. They're there representing the state, and so they are not a party to the case, such that the appellant or the appellee would be a party to the case. The next issue that I want to talk about, and it's probably the crux of the discussion in the brief, is that in this matter, when we look at whether or not equitable estoppel applies, the trial court in this matter did not even look at those particular elements. That standard was not applied by the trial court in this matter. We have cited, and I think the authoritative case in this matter is the case of Blissett v. Blissett, which is a 1988 case ruled on by the Illinois Supreme Court. In that particular matter, in that particular case, there was a mother that brought a petition for delinquent child support against the ex-husband, the father of the children. There was, in that case, actually an agreement. In this case, you'll hear that there may have been agreement, there may not have been agreement. We allege there was not an agreement, but the appellee says there was, even if there was an agreement. The Blissett case, there was in fact an agreement. The parties had said, well, if the father will forego visitation, then he will no longer be required to pay child support. Fast forward for a few years later in that case, and the father then wants to reinsert himself back in, and the mother says, we had a deal, so I'm going to go back and try to collect all that past due child support. Gets up to the Illinois Supreme Court, and the Illinois Supreme Court says, it doesn't matter if you had an agreement. Modification of child support is only a function of the court. There has to be a petition to modify that has to be filed with the court. If that's not filed, then it takes the court out of the process, and the court is the only one that can then determine whether it's in the best interest of the child to reduce the child support. So even though in that case there was an agreement, the mother and the father both agreed that there was an agreement, the Supreme Court said, it doesn't matter. That agreement will not stand. So then they had to look at whether equitable estoppel applies, and in that case, they found that equitable estoppel did not apply, and the big reason why they found that equitable estoppel did not apply was because failing to anticipate unpaid child support cannot be a basis for a detriment to the party. Just because you say, well, now I have to pay in a lump sum, or now I have to pay all this child support that it has accrued, that is not a detriment to the party. In addition to that, even in the discussion in Blissett as it relates to equitable estoppel, the court then went back again and discussed how the court's role is to modify it, and the parties cannot go in and modify it on their own. The other case we've cited is In Re Marriage of Michael, which also has some facts that are very analogous to the instant case. In In Re Marriage of Michael, there was a husband and wife that, again, were trying to negotiate a side deal for the reduction of child support. They had agreed on a reduction in child support, but then when the agreement was prepared, the wife had refused to sign. When it made its way up to the Third District Court of Appeals, the only court of appeals for the Third District, the court again said equitable estoppel will not apply because the husband knew that the wife was not signing the agreement. In this particular matter, when all three of the parties were there at that meeting in 2006, the testimony that's in the record is that Mr. Hodges knew that the parties did not sign the agreement. When they left, there was nothing that was signed. The only thing that he alleges is that the assistant attorney general said she would file an order even without the signatures on it. I think the court will find that because of the high standard in determining equitable estoppel, it's a clear and convincing standard, that you'll find that there are not many cases out there in Illinois in which equitable estoppel has been found to be applied. There are only really two lines of cases in which equitable estoppel has been applied. One is the Duer line of cases. That was a First District case from 1993, In re Marriage of Duer, and also In re Marriage of Junkins, Second District, 2006. In both of those cases, one of them, In re Marriage of Duer, equitable estoppel was actually applied. In the Junkins case, it was not yet applied, but the appellate court said, you need to go back and determine whether equitable estoppel applies. In both of those cases, they involved a change of custody. One or all of the children went from the custodial parent to the non-custodial parent. Then when the custodial parent came back and said, you owe me all of this child support that you had not paid, the court said, no, because custody had changed, then we'll look and say that is a valid agreement that was in place for equitable estoppel. That shows that, in fact, the parties did agree on that, and so they ruled that equitable estoppel applied. The other one is Babcock v. Martinez, which is cited, I believe, in both briefs. It's a Fourth District case from 2006. In that case, equitable estoppel was applied only because the father had moved to Kansas, and the father went to a Kansas court and received a court order out of Kansas, reducing the amount of his child support. The court found in that particular case that that court order out of Kansas was not effective because it did not supersede the Illinois court. Illinois court still retained jurisdiction of the matter, but because the father relied on an actual order from a court of law, then equitable estoppel would be applied. I don't think you'll find either of those cases in this particular matter. Under the Blissett Standard for equitable estoppel, there has to be several, really four points that are met. One is that there has to be a statement of conduct, which I've already mentioned, in this case by Stone to Hodges. The court had to find that those statements induced Hodges to rely on those statements. It has to be to his detriment. Then finally, that Hodges had no knowledge or convenient means of knowing the truth. In this instance, you'll find that none of those were even addressed. So the trial court in this matter did not discuss, did not talk about, and did not rule on any four of those elements. In fact, the only thing the trial court ruled on was general confusion. The order, it's on page 102 in the report of proceedings, the order from the court came from the bench. It wasn't in a written order. The court says, why do I decide that? I decide it because this may be wrong. I will concede this. I don't know if this is the right answer. Somebody's got to call it. I'm calling it. I'm doing it this way because it seems to me that there was general confusion between the parties on it. If there wasn't confusion, Ms. Stone didn't make it abundantly clear that it was $788 and not $165. It seems to me, and the appellate court may disagree, it seems to me that because of these deals, side deals, discussions, whatever the parties did, the record has been made about how they proceeded. So in effect, the trial court, the Honorable Judge Becker, did not even discuss these four elements for equitable estoppel. The judge went back. Even though the judge had already dismissed the claims on an agreement by a prior motion to dismiss, the judge then went back to these side deals and used a standard that would be similar to a mutual mistake of a contract and said there was confusion here. And you can see that he goes off of that confusion because he says there were these deals and side deals. Not only that, he goes further because then he says Ms. Stone didn't make it abundantly clear. Ms. Stone wasn't the one that was alleging equitable estoppel. It was Mr. Hodges that was alleging equitable estoppel. It was Mr. Hodges' burden to show by clear and convincing evidence that equitable estoppel applied. And the judge, in making this decision, shifted that burden and said Ms. Stone did not make it clear to Mr. Hodges what the amount should be. It wasn't her burden to show what the amount should be. There was an original order that said the amount should have been $788. Even if the judge applied those four standards, and I would submit to you, I think the appellee will argue that the judge made specific findings on those. And I would agree that the judge made findings but did not use those particular standards that are set forth by the Supreme Court. Even if the judge would have used those standards, I think you'll find that still equitable estoppel is not met. The elements weren't met there. First, you'll find, and I mentioned earlier on our hearsay argument, there was no statement by Ms. Stone to Mr. Hodges about the reduction in child support. The only allegations that are made as to statements that came from that meeting… Weren't there letters written by her calculating the amount of child support? You can answer. Thank you, Your Honor. Well, there were allegations at the trial court that there were letters that were written in 2009. Ms. Stone said that those were based on a prior agreement. What I'll submit to Your Honor, though, is that there were no exhibits admitted into evidence. There's no evidence that was submitted to trial. That's questionable about whether that's evidentiary. I'm sorry? That's questionable about whether those letters are evidentiary. I believe so. Those were never even submitted for authentication trial. I'll give you an opportunity to respond and reply. So, I believe… My time is up, so unless the court has any other questions… I asked the question right at the time when your time was up. So, I'll give you an opportunity to reply. We'll hear now from the appellate. Thank you. May it please the court, counsel. Tim Roth for appellee Todd Hodges. If I could start in kind of a sideways direction and get to your question almost immediately. I had filed a motion to dismiss the appeal. And that was really because the appellant had misstated the statement of facts and ignored that compelling piece of evidence that Judge Becker was relying on, which was a letter that was written in 2010. It included a summary up through 2010 of payments. There were attached to it spreadsheets showing 2007, 2008, 2009, and part of 2010 payments. All accounted for at $165 a week. That was the critical piece of evidence that Judge Becker was asking the appellant to explain when she was on the stand and allowed her several opportunities to try and explain that. And at the end of her explanation, the best that he could say was that there was confusion about her explanation, but not about the elements of equitable estoppel. That is not what he was referring to. What about the letter being an evidence? Well, it had been submitted under affidavit in the motion for summary judgment. When it was presented in court, a copy of it was handed to the appellant's attorney, and then the witness, Mr. Hodges, authenticated the document. The judge was reading along on the screen because the document was part of the court record. It's part of the record on appeal. It was attached to my brief as well. That document was available in the courtroom. It was in her own handwriting. She admitted that she had written that document. She wasn't able to specify exactly when she had written it, but she did admit that she wrote it, and it did say, thank you for catching up at $165 a week. So clearly she had taken action. In addition to the summaries and that letter that Mr. Hodges had saved, she'd also cashed checks. There were 138 checks during the period where Judge Becker found equitable estoppel, and 134 of those 138 were in even multiples of $165. But it was really to this question of whether the record was complete that I filed that motion to dismiss because the other thing that the appellant brought up was the long explanation that Judge Becker gave about his personal knowledge of how the assistant attorney generals work with pro se clients in the court. He was concerned that maybe he was overstepping by using his own personal knowledge in addressing the question of what went on on that day when they all met at the courthouse. That issue was discussed at great length in a hearing in November of 2016, which the court didn't have the record on. And I didn't think that this was going to be an important issue because it doesn't play directly on the question of equitable estoppel, but it was my feeling that through the incomplete statement of facts and ignoring that document that was submitted and verified in the court, and the judge relied on that in making his decision and questioning or expressing his concerns to the appellant about her actions, all of that was glossed over by the appellant in his brief. And sure enough, I can correct the statement of facts, and I believe I did. But when it comes down to having no report of that proceeding in November of 2016, that's missing. That was where Judge Becker addressed the question, that specific question of whether or not you could have a modification of child support without a petition to modify. And despite the decision of the Supreme Court, he said it was common practice in the Clinton County Courthouse to do that. But none of that makes a difference. What we've got here is equitable estoppel. We don't need an agreement. What we need are behavior of the parties in order to justify equitable estoppel. And we have that here. We've got that in spades. Mrs. Stone is accepting these, accounting for the payments in that way. We've got Mr. Hodges responding in kind, in paying the child support, catching up every year. He's a construction worker, so he'd fall behind when he was on unemployment during the winter months. As soon as he got his tax return, he'd make a large payment in multiples of $165 to catch up. He was induced not to pursue any sort of further legal action in 2006. When they were divorced in 2004 to 2006, his income dropped over 30%. That's outlined in my brief as well. And that was not the question of hearsay, which I'll get to in a minute, but all the elements were there. The detriment to him, $16 a week was the difference in the payments between what the court order was and what they managed over all those years and what Mrs. Stone, the appellant, accounted for. So the detriment to him was this relatively small payment that ballooned into a $10,000, a $17,000 lien with the interest that accrued on his house when HFS got back into the case. It was reasonable. He was in the courthouse. The judge and the clerk tell all pro se litigants, you can't change the child support order on your own. You've got to come back to court. He came back to court. Under threat of imprisonment, losing his license, and all the other possible penalties of being behind on his child support. He left the courthouse that day thinking that he had come to an arrangement. But more importantly, Mrs. Stone behaved like they had come to an arrangement over an extended period of time. She turned around the following month. Based on that agreement that they came to, they talked about child support, and there is a copy of this agreement. The draft copy of the agreement was kept by Mrs. Stone. Mr. Hodges thought it was going to be filed. That's what he says the Attorney General, the Assistant Attorney General there, had told him. She kept the copy of the agreement. It showed in the rearage, which she later went and got a judgment lien without a judgment based on that amount that was on that order. And it also showed a judgment lien without a judgment. They attached the non-pro-tump order that corrected the original dissolution order because the original order had said that she would pay him child support rather than him paying her. And so they just attached that and said that due and owing under that order was the amount of $10,000. When he went to refinance his house, his banker recommended that he go ahead and pay that off, so he refinanced extra and took a loan to pay off his child support, the arrearage that had been agreed upon but never entered as a judgment. He never had an opportunity to litigate that amount. And there was certainly question about that. Mrs. Hodges, when she had got the order non-pro-tump in January of 2006, it said that he had been paying his child support from him to her, and so this was just a scrivener's error in the order that her attorney had drafted saying that she would pay him. So the court entered the order non-pro-tump to correct the language on that. Six months later, she got HFS involved and told them that he hadn't paid any child support at all. So she's got a history of playing this to her advantage and not maybe following the rules as well as possible. Her lawyer went and filed that lien on Mr. Hodges' house, no notice to him, but filed the lien as a judgment lien saying that due and owing under the attached order or non-pro-tump order, which wasn't even the dissolution order, but that attached to his house, he paid it off in August of 2008 when he was refinancing his house, so he paid that off. They continued on with these payments of $165 a week right up until 2014 when Ms. Stone went back to HFS and asked them to re-intervene. Now they had withdrawn from the case, we found out. They had filed their withdrawal with the court, but they hadn't notified anybody of that, and so Mr. Hodges was not aware that that order was not entered. They had withdrawn, and then they re-intervened without any permission from the court. They just got back into the case, and where in 2006 when they left the case, they'd said, we won't garnish his wages, we won't garnish his unemployment, we won't intercept his tax returns. They got back in in 2014 without consulting the court, and they started doing all that. And they started collecting based on an affidavit from Ms. Stone, which was shown to be wrong. One of the counts that we had in this original petition to determine the arrearage was that Mr. Hodges had submitted check images to HFS asking them to recalculate how much he owed based on how much he paid, and it turned out that he had paid in excess of $4,000 more than her affidavit stated, despite her careful accounting in these accounting sheets, which are part of the record on the case. So there are a lot of equities in this one. The judge had the opportunity. He saw both parties testify. He heard their testimony. During the testimony, he expressed the concern. What he needed to hear was an explanation of that letter saying, $165,000 is it, and you're catching up at $165,000 a month. And again, I guess I skipped over the elements again, but I had detriment. And so the detriment was his ability to go back and get a modification when his income had dropped 30-plus percent. The detriment was $16 a week would have been easy, but $17,000 was huge. And the $7,000 at 9% interest, if the 9% interest isn't a detriment, I mean, it's certainly not the going interest rate these days. And then it was reasonable, and he had no knowledge, because he thought this had all been taken care of in the court, and he never heard anything more. He wasn't represented by an attorney. He had no idea whether he should receive paperwork or not. But what he did was, for the next eight years, live with his $165 a week, and it was accounted for in that way, and so he kept making those payments. And I did touch on some of these equities of the situation. And Mrs. Stone was shopping back and forth between HFS and the trial court. One of the big things that caused all sorts of confusion in this case is I was particularly concerned with the actions of HFS in this case too, because they were a tool of Mrs. Stone to torture Mr. Hodge. They relied on her affidavit. They refused to consider his evidence. He submitted a list of all the checks he paid first. They said that wasn't good enough. He submitted every check image of every child support payment he made between 2006 and 2014 when they came back into the case. They promised at the hearing, they finally had a hearing, and they still said, we haven't done the accounting yet, and we can't listen to your argument of the equitable argument that you should be paying something different than the order. But they went ahead and issued a finding on that equitable argument anyway, and then promised in their final order, they said, and we're going to be filing something in Clinton County Court for an adjudication of the arrearage. They prepared that document, but they never filed it. They never reintervened, and they never filed the document that they had promised him that they would file. Finally, he had to get an attorney. And so this whole case, or the determination of arrearage in the Clinton County Courthouse started off with confusion because the state contended that it was actually an administrative review action when it wasn't. It was 2004 D4 trying to figure out what he owed based on the actions of the participants. And so this is an equitable argument that is one of all of the behavior of the clients, and Judge Becker, having gone through multiple hearings on this, not just the final evidentiary hearing that was involved and that you have a transcript for, but other hearings, and being inundated with a barrage of paperwork on this case, he was well aware of all the elements, and there were plenty of examples where those could be found in this. And it's not incumbent on him to spell out each of the elements in this. He found that equitable estoppel applied, and he was in a position to see the equities of all the actions of both parties and hear their testimony and judge their credibility. And so it was well within his discretion to apply the principle of equitable estoppel in this case. I would like to touch on the Babcock v. Martinez case. It's been suggested in some articles out there that one element of equitable, it's not even an element of equitable estoppel, but one element of the fact pattern that can suggest that equitable estoppel should apply is the color of law. And in the Babcock v. Martinez case, the guy was out in Kansas, and sure enough, he got an order from a court out there to collect child support from him. He comes back and he faces a huge payment that would be a windfall to the ex-wife, and there equitable estoppel applied. This is very much a similar case. It wasn't a court in Kansas. It was the Clinton County Courthouse where Mr. Hodges showed up. He met with an assistant attorney general who had the full authority to deal with these pro se litigants. Judge Becker was aware of how that process worked, and that's where he was concerned that maybe his knowledge of that process and having worked in the Clinton County Courthouse for many years and with many different assistant attorney generals, maybe all of that was a concern for him. But it didn't change any of the elements here. He still was able to find those. They're all in the evidence. And what we've got here is the color of law of that courthouse that made it reasonable for Mr. Hodges to believe that. One last thing was the hearsay, and that was the first thing that Mr. Groenke brought up. The question of hearsay in this case was one about, you know, was the testimony presented for the truth of the matter, and it wasn't. None of these things that were hearsay if we were trying to argue that he should have got a modification, that there was an agreement, any of those things would have been hearsay because he was saying she told him something. But here he heard something, and this made it reasonable for him to believe that this agreement was in place, that he could function at $165 a week and he could reasonably rely on it because he heard it from an attorney. And it's only the fact that it came out of her mouth that he could testify to, and there was plenty of evidence, including the partially filled in uniform support order, that showed that Mr. Hodges wasn't lying about that, that it was substantiated by other evidence, and that he would reasonably rely on what happened in that meeting on November 15, 2006. Thank you. Thank you, gentlemen. Mr. Weiss? Let me first, Your Honors, address the question that Justice Moore tendered to me at the end of mine, and that was about the letters. A couple of things with that. One is, and I mentioned at the end of my last argument, that those weren't admitted into evidence. We've cited in our reply brief a couple of cases. One in particular is People v. 1-1999 in Lexis, which was a forfeiture case. It was 2nd District in 2006. In that case, the court said that a document must be offered by its proponent and admitted into evidence by the trial court before it may be considered as evidence. Then it goes on to say it is error to permit the trier of fact to consider documents that have not been tendered or admitted into evidence. In this instance, none of those were tendered or admitted into evidence. They weren't authenticated. So there were absolutely no exhibits that were admitted into evidence in this matter. So there's discussion by the appellee that there's this agreement, there's a letter, there's accounting sheets. None of those were submitted into evidence. Even if they were, Ms. Stone testified that those were a result not of the 2006 court meeting, but of a 2008 agreement in which she had told Mr. Hodges that she would accept a lower amount if he got current, which then she testified at trial. Then in 2010, he wasn't caught up, so she terminated that agreement. So it's a different agreement altogether. Notwithstanding that, let's assume for the purposes of argument that, in fact, there was an agreement. Now you have a fact pattern that is exactly like Blissett. They said there's an agreement between the parties. And so if Judge Becker would have said, I find there's an agreement between the parties, and if this honorable court says, I find there was an agreement between the parties, and we're going to look at that for equitable estoppel, the Supreme Court in Blissett says that doesn't matter. Even if there was an agreement, it meets the fact pattern exactly under the Blissett court. You'll have, the appellee argued also that this all started because the state of Illinois got involved in helping Ms. Stone. And, in fact, it all started because Mr. Hodges was behind in child support. So he's trying to play Mr. Hodges as the victim, when, in fact, he was the one that all parties agree at trial that was behind in child support continually, whether it was the reduced amount or the other amount. The other thing I'll submit to you, and I'll close with this, is that there was argument made that this was similar to the Babcock versus Martinez case because of the color of law. There was never an order in this matter. In the other case, there was an actual court order, a report of law by Kansas that was issued that he relied upon. In order for, and Judge Becker didn't even go this far. Was there a proposed order signed? There was not a proposed order signed. There was actually, one of the documents that was discussed at trial was a worksheet that was being worked off of between the parties that showed the arrearages. Then neither party agreed to it. Neither party signed it. So that order was never entered. Again, it wasn't even submitted at trial as evidence. I know it wasn't entered, but when they left the courthouse that day, what was the understanding of each party? The understanding, as it relates to the record of proceedings, it'll show this. When Ms. Stone and Mr. Hodges left, there was no order that was going to be entered. Mr. Hodges even testified under cross-examination that when they left, his statement to her was, I'll take care of you. I'll make good on it. It wasn't until, when you mentioned a month later, there was a lien filed. It was because he didn't make good on it at that point. There was never an agreement that was entered into. There was never an order that was entered into. He just said that he would make good on catching up on that child support. The other thing that I'll submit to you is that in order to believe and bring this within the same thing as the line of cases Babcock, you would have to believe that the Assistant Attorney General lied to Mr. Hodges and said, I will have this order entered. You have to make that jump in order to say that it was actually under color of law,  it had to have come from her mouth as the Assistant Attorney General. And I think that's a large leap to make. Judge Becker didn't even go that far in making that. He just relied on the general confusion. So I think the court understands my argument. I rely on, like I said, my point for the others. I just ask that you reverse the order of the trial court. Thank you, counsel. Thank you. We'll take the matter under advisement and issue a decision in due course. I hope we all take up the next case in green.